**JON M. SANDS**
Federal Public Defender
**MICHAEL P.P. SIMON**
Assistant Federal Public Defender
State Bar No. 013096
mike_simon@fd.org
407 West Congress, Suite 501
Tucson, Arizona 85701-1716
Telephone: (520) 879-7500
Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | ) | |
|---|---|---|
| | ) | CR14-637-TUC-RM (LAB) |
| Plaintiff, | ) | |
| | ) | **MOTION TO SUPPRESS** |
| vs. | ) | **EVIDENCE** |
| | ) | |
| Matthew Maley, | ) | (Evidentiary Hearing requested) |
| | ) | |
| Defendant. | ) | |
| | ) | |

It is expected that excludable delay under Title 18, United States Code §3161 (h)(1)(D) will occur as a result of this motion or an order based thereon.

Defendant, Matthew Maley, by and through undersigned counsel, pursuant to FED. R. CRIM.P. 12(b)(3)(C), and the Fourth Amendment to the United States Constitution, hereby moves to suppress all unlawfully obtained evidence as set forth in the accompanying Memorandum of Points and Authorities.

RESPECTFULLY SUBMITTED: October 31, 2016

JON M. SANDS
Federal Public Defender

<u>  s/    **MICHAEL P.P. SIMON**         </u>
Assistant Federal Public Defender

Copy delivered electronically this date to:

Shelley K.G. Clemens, Assistant United States Attorney

# MEMORANDUM OF POINTS AND AUTHORITIES

## PROCEDURAL BACKGROUND

On November 13, 2013, Matthew Maley was indicted along with Jennifer Sanders and Aubrey Savage, in the District of New Mexico for violations of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A) : Distribution of Methamphetamine; and 18 U.S.C. § 2: Aiding and Abetting in CR 13-3696. On the same day a warrant for his arrest was issued.

On March 19, 2014 a superseding indictment was issued adding two more co-defendants and twelve more counts, including 21 U.S.C. § 846: Conspiracy; 21 U.S.C. § 841 (a)(1) and (b)(1)(A) Possession With Intent To Distribute 50 Grams or More of Methamphetamine; and 18 U.S.C. §§ 922 (g)(1) and 924(a)(2): Felon in Possession of a Firearm and Ammunition (counts 13 and 14).

On April 2, 2014, Matthew Duke Maley was also indicted in the District of Arizona on three counts: 18 U.S.C. §§ 922(g)(1) and 924(a)(2): Possession of Firearms by a Convicted Felon; 21 U.S.C. §§ 841 (a)(1) and 841 (b)(1)(C) Possession with Intent to Distribute Methamphetamine; 18 U.S.C. §§ 924(c)(1)(A) and 924(c)(1)(A)(i): Possession of Firearms in Furtherance of a Drug Trafficking Offense including a Forfeiture Allegation, in CR 14-637.

On September 25, 2014, Mr. Maley was convicted following trial in the District of New Mexico. (No motion to suppress the evidence was ever filed in the New Mexico case.) He was sentenced to 262 months on the conspiracy and drug counts of the superseding

indictment and a 120 month concurrent sentence as to count 14: Felon In Possession of Firearms.

On January 20, 2016, he was arrested in the District of New Mexico on an arrest warrant from the District of Arizona and made his initial appearance in court on February 9, 2016.

**RELEVANT FACTS**

According to the Affidavit in Support of Search Warrant, which was sworn to by FBI Special Agent Kuretich before a Federal Magistrate in Tucson, Arizona on November 19, 2013, Mr. Maley and others had been the subjects of an investigation into the distribution of methamphetamine in Southern New Mexico. Between June and September 2013 a number of undercover methamphetamine and firearms buys were made in the Las Cruces, New Mexico area. At that time, Matthew Maley was living at the Sunny Acres RV park in a white and blue Sportman 28-foot travel trailer. Agents learned that Mr. Maley had purchased the trailer for $7000 from a Las Cruces car dealer.

Sometime in October 2013 agents believed that Mr. Maley had left Las Cruces and relocated to 1920 West Gardner Lane, Tucson, Arizona. On November 8, 2013, several of his vehicles and the RV trailer were observed by FBI agents parked at the Tucson residence. They observed that the RV was parked in the driveway with the water, sewage, and electrical lines hooked up to the residence. The slide-out compartments on the RV were extended to full capacity to expand the living space inside the trailer. The extension stairs below both

entry doors were deployed and the trailer appeared to be set-up in a manner consistent with a person actively living within the RV.

On November 9, 2013, agents observed the RV to be in the same condition and noted that two vehicles were parked in different positions within the driveway. As previously indicated, Mr. Maley was indicted in the District of New Mexico on November 13, 2013 and a warrant was issued for his arrest.

During Mr. Maley's trial in the District of New Mexico in September 2014, a photograph was introduced into evidence as Government Exhibit 122. On the photograph it is noted that the driver is Matilyn Kay Maley. It also contains the date 11-15-13, and the notation: I-25 N/B USBP LPR PHOTO. It is described in the Government's Exhibit List as: Photo of Mathew Maley and his daughter Matilyn Maley at the USBP checkpoint on 11.15.2013. A witness testified that she also was in the vehicle, a Land Rover, along with Maley and his daughter, and that they were driving north from Las Cruces to Albuquerque and that the trip took place around November 15 or 16, 2013.

During the evening hours of November 16, 2013, agents drove by the Gardner Lane residence in Tucson and observed the RV to be in the same condition as they had previously noted and that two of Maley's vehicles were parked near the trailer.

According to the Presentence Report prepared by the Probation Office in the District of New Mexico, Mr. Maley married Denise Yates in 1992 in Colorado. They remain married but have been separated for over ten years. They have three children, Tyler Colton Maley,

Chet Jack Maley and Mattlyn Kay Maley. Mrs. Maley and the three children all reside in Tucson. Matthew Maley is described as 6'2'' and 190 pounds in weight. In November 2013 Denese Maley and her son Chet, were living in a double-wide trailer at the 1920 West Gardner Lane, Tucson, residence.

On Sunday November 17, 2013, at approximately 9:00 a.m. FBI agents from Las Cruces and Tucson as well as a sergeant from the Pima County Sherrif's Department went to 1920 Gardner Lane, Tucson, with the intention of arresting Matthew Maley and "administratively seizing his vehicles and RV pursuant to the las Cruces investigation." Both Mr. Maley's sons, Chet and Tyler Maley were present in the front yard when the agents entered the residence. Agents detained Chet and Tyler in the front yard and then approached the open front door of the residence. According to the subsequently filed Affidavit in Support of Search Warrant, agents knocked and announced their presence several times at the double-wide trailer, repeatedly shouting: "FBI with an arrest warrant. Matt Maley we have an arrest warrant. Come to the door." No response was received. They waited for 3-4 minutes before entering the residence to search for Matthew Maley but found nobody within the residence.

Agents then attempted to open the door to the RV but it was locked. Again according to the Affidavit, they explained to Mr. Maley's adult sons that they needed to check the RV for their father and they were going to seize the RV and take it back to the FBI office and therefore needed a key to enter the RV (since it was apparently locked from the outside).

6

Apparently, the Maley sons were uncooperative and refused to assist agents in finding the key to the RV.

Agents thereupon used a breaching tool to overcome the lock on the RV door and entered the trailer. The agents noticed numerous items stored inside the trailer. According to the Affidavit, while searching the trailer for Maley, the agents observed the following items in plain view: multiple firearms, dozens of rounds of ammunition, a ballistic vest with tactical armor plates (similar to FBI SWAT or military operations vests), a large bundle of U.S. currency, three plastic bags containing a crystalline substance resembling methamphetamine, drug packaging material (to include plastic wrap, plastic bags, and a digital scale). Approximately 10 rifle cases and numerous pistol holders were also observed in different places throughout the trailer. The Affidavit continues: "Although agents seized the trailer pursuant to federal drug forfeiture procedures; agents suspended their inventory of the RV pending the issuance of the requested search warrant. Agents secured the trailer, made it ready for highway travel, and towed it to the Tucson FBI Office where it remains."

Two days later, on November 19, 2013, FBI Special Agent Kuretich filed an Application For Search Warrant with the accompanying Affidavit which was signed by a Federal Magistrate in the District of Arizona that day.

A somewhat different version of what occurred during the search and seizure of the RV was provided during Mr. Maley's trial in the District of New Mexico. Deputy Curtis Yarnell of the Dona Ana Sheriff's Office testified as follows on direct examination;

| | | |
|---|---|---|
| 1 | Q. | After agents had finished searching any of the other residences on the property, did you knock and announce on the RV trailer? |
| 2 | | |
| 3 | A. | Yes. |
| 4 | Q. | Can you briefly describe what that involved? What happened? |
| 5 | A. | What we did is, as soon as I had enough personnel to help search - - or you know, search the RV, we did a knock-and-announce. We did breach the door to go into the trailer. We did enter the trailer and observed that Mr. Maley was not in the RV. |
| 6 | | |
| 7 | | |
| 8 | Q. | And you were there – was the purpose looking for Mr. Maley? Is that why you were actually there? |
| 9 | | |
| 10 | A. | Yes. |
| 11 | Q. | So once you didn't see him, what happened? |
| 12 | | |
| 13 | A. | We searched some of the larger closets to make sure nobody was hiding in the closets; observed a couple of firearms within the trailer. |
| 14 | | |
| 15 | Q. | And then what did you do after that? |
| 16 | A. | We went ahead and…We went ahead and secured it and took it And took it with – all the property with us. |
| 17 | | |
| 18 | On cross examination, Deputy Yarnell was questioned further: | |
| 19 | Q. | One of the last things you said, I just wanted to make sure that I'm not misrepresenting, is that you and the agents took property out of the trailer, out of the RV; is that right? |
| 20 | | |
| 21 | | |
| 22 | A. | Not out of the trailer, no. We took the whole trailer with us. |
| 23 | Q. | Okay. So is it your testimony that there were no items seized or handled by agents at that particular time on November 17th? |
| 24 | | |
| 25 | A. | I can't recall. |
| 26 | | |
| 27 | | |
| 28 | | |

8

| | | |
|---|---|---|
| 1 | Q. | You were the first one to make entrance, right? |
| 2 | A. | I was the first one to make entry, yes. |
| 3 | Q. | Do you remember seeing guns? |
| 4 | A. | I did, yes. |
| 5 | | |
| 6 | Q. | Do you remember agents tagging and identifying guns as exhibits or evidence? |
| 7 | | |
| 8 | A. | No. |
| 9 | Q. | Okay. |
| 10 | A. | I don't recall, no. |
| 11 | | |
| 12 | Q. | Okay. So it your testimony that you don't remember any agent touching any of the items in the RV? |
| 13 | | |
| 14 | A. | I can't recall. I don't believe so, no. |
| 15 | Q. | Did you yourself, touch anything? |
| 16 | A. | No. |
| 17 | Q. | Okay. How many people went into the trailer at that point in time? |
| 18 | | |
| 19 | A. | It was a small trailer. I would say at least four, three to four of us, four of us. |
| 20 | | |

21  (Transcript of Record of Jury Trial Vol. II, 98-100, United States v. Matthew Maley, 13-CR-03696 RB, September 23, 2014.)

22
23       A second individual, Special Agent Greg Waterson, who was one of the three other
24  agents to enter the trailer, also testified at the New Mexico trial as to what he observed:

25       Q.    Did you see anything of note while you were inside the trailer?

26
27                                          9
28

A. The trailer was full of items. I don't personally recall seeing any firearms or anything of contraband in there. I was only in there briefly, but the travel trailer was full of numerous items.

(Transcript of Record of Jury Trial Vol. III, 170-171, United States v. Matthew Maley, 13-CR-03696 RB, September 24, 2013.

On the issue of the agents' authority to enter the RV and then seize it, FBI Agent Bryan Agee testified as follows under cross-examination :

Q. ….On August – or I'm sorry, on November 17th, you did not have a warrant to search and seize items in Mr. Matthew Maley's from Mr Matthew Maley's residence; is that true?

A. That is true. I had an arrest warrant. And then we intended to administratively seize the vehicles that were there and the trailer pursuant to forfeiture.

Q. Okay. Now, other than the administrative seizure – well, let's go back so we can explain this a little bit to the jury. You had an administrative order or directive to seize the vehicle in order to eventually then search the vehicles?

A. No. What I had was the authorization from the FBI, the approval, to seize the vehicles to go through forfeiture proceedings, civil forfeiture proceedings, based on them being – or us suspecting them of being drug proceeds. Separate from that, I had an arrest warrant just to arrest the defendant.

Q. Okay. Thank you for that. Now the next question is, on that day, November 17th, other than seizing the vehicle for forfeiture purposes, did you obtain any additional evidence?

A. Well, I would say yes because, when we entered the trailer to search for Mr. Maley, I saw items that I recognized to be contra band. So once we cleared the trailer, while they were in plain view, rather than seize them at that moment, I seized the entire trailer. We drove it back to an area where I could secure a vehicle that size, which was the Tucson FBI office. We taped it up and sealed it. We applied for a search warrant. And we didn't break those seals until we had an authorized search warrant.

10

As to when the search warrant was actually obtained, Agent Acee stated:

A. Okay. Sir, I have documentation here to include the search warrant, and it was issued on the 19th of November by the Honorable Bernardo Velasco, U.S. Magistrate Judge, in Tucson.

Q. Thank you, Agent Acee.  So, if I'm understanding your testimony correctly, on November 17th, you seized the trailer or the RV?

A. Yes.

Q. Okay. And in addition to seizing the RV, you seized all the evidence or the material evidence or material items within the RV?

A. Well, I don't feel that I seized them yet because I hadn't identified them, we hadn't actually taken them from the trailer. I had an awareness that there were items of evidence in there that we would want. So I don't want to be confusing. But I don't feel that we seized them yet because we hadn't put our hands on them. We basically seized the entire RV. I returned to Las Cruces to return the other Las Cruces agents, pack some clothes, and I turned around and headed back to Tucson. So we didn't do the search, what I would call the "search and seizure," until the 19th, two days later.

(Transcript of Record of Jury Trial Vol. I, 113-116, United States v. Matthew Maley, CR-13-03696-RB, September 22, 2014.)

**LAW AND ARGUMENT**

**EVIDENCE SEIZED AS A RESULT OF AN UNLAWFUL ENTRY OF DEFENDANT'S RV TRAILER WITH ONLY AN ARREST WARRANT MUST BE SUPPRESSED**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV. "At the very core" of this guarantee "stands the right of a man to retreat into his own home and there to be free from unreasonable governmental intrusion."

*Silverman v. United States,* 365 U.S. 505, 511, 81 S.Ct. 679, 5. L.Ed. 2d 734 (1981). Indeed, the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. U.S. Dist. Ct.* 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed. 2d 752 (1972). Thus, "[i]t is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." P*ayton v. New York,* 445 U.S. 553, 586 100 S.Ct. 1371, 63 L.ed. 639 (1980) (internal quotation marks omitted).

Where it applies, the exclusionary rule prohibits the government from introducing in its case in chief evidence obtained in violation of the Fourth Amendment. *See* e.g. *Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed. 1081 (1961). In *Hudson v. Michigan,* 547 U.S. 586, 126 S.Ct. 2159, 165 L.Ed. 2d 56 (2006), the Supreme Court addressed the question of whether exclusion was warranted when law enforcement officers violated the knock-and-announce rule while executing a search warrant. The Court held that it was not because the knock-and-announce violation did not expand the breadth of the search authority conferred on the officers by the search warrant they had in hand, pursuant to which they already were privileged to obtain the incriminating evidence. *Id.*at 592, 126 S.Ct. 2159.

In a recent case in the Court of Appeals for the District of Columbia, this Court considered whether *Hudson* mandates the same result for violations of the knock-and-announce rule in both the search and arrest warrant contexts. In *United States v. Weaver,* 808 F.3d 26 (D.C. Cir. 2015), the Court concluded that the arrest warrant context is

materially distinguishable from the search warrant context. *Id.* at 37. In *Weaver* agents from the Bureau of Alcohol, Tobacco, Firearms and Explosives, armed with an arrest warrant, learned that Michael Weaver was living in an apartment building. Upon arrival at the building, the agents knocked on his apartment door twice. They heard no answer but heard movement inside. They were not concerned Weaver would flee out a window because the apartment was on a high floor. Less than a minute later, the agents announced 'police' and immediately used a key they had obtained from the building's concierge to unlock the door. They did not inform Weaver that they had a warrant for him. As the agents attempted to open the door, someone inside tried to hold the door closed. The officers were able to push the door open and, after a brief struggle, they subdued Weaver, arrested him, and removed him from the apartment. In the course of arresting him, the officers smelled marijuana. One of the officers testified that as soon as he came in he observed bags of marijuana on the counter. Based on those observations, the officers obtained a search warrant to the apartment and found several kilograms of marijuana, other drugs, and $10,000 in cash. *Id.* at 32.

The W*eaver* court framed the issue at hand as follows: "If the officers' forcible entry into Weaver's home was unlawful, their presence in his home was also unlawful, and their observations could not serve as the basis for a search warrant. Consequently, the sole question before us is whether the exclusionary rule applies to evidence obtained as a result of a knock-and-announce violation committed when law enforcement officers execute an arrest warrant as opposed to a search warrant." *Id.* at 33. Distinguishing their facts from those in

*Hudson,* the court began its analysis by noting that: "An arrest warrant reflects no judicial determination of grounds to search the home, rather it evidences probable cause to believe that the arrestee has committed a crime, and authorizes his arrest wherever he might be found. If an arrestee is found away from home – at work, on the street, or at someone else's home – the privacy of his home remains inviolate. So, too, **if an arrestee is not at home when officers seek him there,** or if he comes to the door and makes himself available for arrest, **the arrest warrant does not authorize officers to enter the home**. Any prerogative an arrest warrant may confer to enter a home is thus narrow and highly contingent on the particular circumstances of the arrest." (Emphasis added). *Id.* at 30-31. The court went onto say that [t]he requirements for search warrants and arrest warrants protect distinct privacy interests and the two types of warrants authorize law enforcement offices to take different actions." *Id.* at 37. An individual's interest in protecting the privacy of his home is of the highest order. *See e.g. Jardines*, 133 S.Ct. at 1414, *Kyllo v. United States,* 533 U.S. 27,31, 121 S.Ct. 2038, 150 L.Ed. 2d 94 (2001). "At the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Kyllo* 533 U.S. at 31, 121 S.Ct. 2038 (internal quotation marks omitted); see also *Jardines,* 133 S. Ct. at 1414 ("[W]hen it comes to the Fourth Amendment, the home is first among equals.")

The *Weaver* court opined that: "Officers armed with only an arrest warrant – who, for whatever reason did not seek or were unable to obtain a search warrant – have a strong

14

incentive to violate the knock-and –announce rule. Entering a home unannounced to execute an arrest warrant increases the chances that officers will gain entry to parts of a home they would not otherwise have entered to carry out an arrest and will thereby give themselves an opportunity to find incriminating evidence they otherwise would never see." *Id.*at 43. Thus, the court held that in the arrest warrant context – unlike the *Hudson* search warrant context – the application of the exclusionary rule would result in appreciable deterrence of constitutional violations. Consequently, the court concluded that the district court should have excluded the fruits of the constitutional violation in *Weaver* and reversed the district court's denial of the defendant's motion to suppress.

Searches and seizures of dwellings without a warrant are unjustified under the constitution unless incidental to a lawful arrest. *United States v, Sam Chin*, 24 F. Supp 14 (D. Md. 1938) This is clearly not the situation in the instant case because once the agents broke into the RV they found nobody inside.

Exigent circumstances are required to enter someone's home and conduct a search without a warrant and without consent, even if agents have probable cause and statutory authority to arrest the suspect. *Payton v.NewYork,* 445 U.S. 573 (1980). The exigent circumstances exception is premised on "few in number and carefully delineated" circumstances. *United States v. United States District Court,* 407 U.S. 297, 318, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) in which "the exigencies of the situation" make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under

the Fourth Amendment." In *United States v. Struckman*, 603 F.3d 731, 743 (2010), the Ninth Circuit reiterated its previous definition of such situations "..as (1) the need to prevent physical harm to the officers or other persons; (2) the need to prevent the imminent destruction of relevant evidence; (3) the hot pursuit of a fleeing subject; and (4) the need to prevent the escape of a suspect. *See* e.g. *Fisher v. City of San Jose,* 558 F.3d 1069 1075 (9th Cir.) (en banc)(safety); *United States v. Ojeda,* 276 F.3d 486, 488 (9th Cir. 2002)(safety, escape, and evidence). "The government bears the burden of showing specific and articulable facts to justify the finding of exigent circumstances." (*Ojeda* at 488).

Most recently, in *Mendez v. County of Los Angeles*, 815 F.3d 1178, (9th Cir. 2016) the Ninth Circuit again addressed the issue of whether warrantless searches may be justified under the exigent circumstances exception. In *Mendez* two deputies who were part of a twelve person team of Los Angeles County Sheriff's Department deputies, responded to a call from a fellow officer who believed he had spotted a wanted parolee who had been classified as armed and dangerous. Based on a tip from a confidential informant, members of the team went to a house in front of which the fugitive was observed to be riding a bicycle. They did not have a search warrant to enter this property. First of all they banged on the security screen outside the front door. The owner of the residence refused to let them in since they did not have a warrant but opened the door when the officers retrieved a pick and ram to bust open the door. The officers entered, pushed the owner to the ground, handcuffed her and placed her in the backseat of a patrol car. They did not find anyone in the house. They then

decided to clear the backyard including a shack that was surrounded by an air conditioning unit, electric cord, water hose, clothes locker and clothes. They did not knock and announce their presence but opened the door of the shack and then shot a man inside who appeared to be holding a gun. A Civil Rights action under 42 U.S.C. § 1983 followed.

The *Mendez* case is instructive not only because of the somewhat analogous fact pattern to the instant case, but because of the court's analysis of the exigent circumstances argument:

> As the Supreme Court held in *Steagald v. United States,* 451 U.S. 204 (1981), exigent circumstances to enter a home do not exist merely because the police know the location of a fugitive, even if they possess an arrest warrant for that person. *Id.* at 211-12. In *Steagald*, the police received a tip from a confidential informant regarding the location of a "federal fugitive wanted on drug charges." *Id.* at 206. The officers executed an arrest warrant at that location two days later, but the Court held that the search-warrantless entry could not be justified absent exigent circumstances. *Id.* at 211-212. **The Court rejected the view that "a search warrant is not required in such situations if the police have an arrest warrant and a reason to believe that the person to be arrested is within the home to be searched."** (Emphasis added). *Id.* at 207, n.3…..

*Mendez v. County of Los Angeles,* 815 F.3d 1178 (9th Cir. 2016).

There were no exigent circumstances justifying the unlawful entry – with an arrest warrant only – of Matthew Maley's RV on November 17, 2013. The trailer had been under surveillance since November 8, even before the issuance of the arrest warrant in the District of New Mexico on Novermber 13. It was observed to be parked in the driveway with utility lines hooked up to the main double-wide trailer (and thus not capable of being moved quickly). FBI agents from New Mexico and Arizona, and a local Pima County sheriff

apparently had sufficient time to coordinate, plan, travel, meet and execute the arrest warrant. They moved on the Gardner Lane address in Tucson in sufficient numbers to subdue Mr. Maley's two sons, knock and announce and   enter and search their residence without consent. Three or four agents then proceeded to knock and announce, and then forcibly enter the RV which appears to have been locked from the outside, without even the sound of movement from within as in *Weaver*. In today's day and age they could easily have obtained a search warrant prior to making this unlawful entry since they had the premises secured.   Instead, they chose not to wait but to break into the RV and then to conveniently find incriminating evidence in plain view. What they saw is not certain since the accounts contained in the Affidavit in Support of the Search Warrant and the trial testimony of the first agent to enter are markedly different. Nor is it clear how much time was spent inventorying this illegally obtained evidence before the decision was made just to go ahead and seize the entire trailer, and then apply for a search warrant. They didn't even immediately apply for a search warrant, again as in *Weaver,*but waited two full days, enough time for FBI Agent Acee to return to Las Cruces, drop off fellow agents in Las Cruces, pack some clothes, and go back to Tucson.

All of this is even more troubling in light of the fact that a photograph was introduced in Mr. Maley's trial in the District of New Mexico taken by a license plate reader at a checkpoint on I-25 between Las Cruces and Albuquerque which was identified as a photograph of him and two other individuals taken on November 15, 2013 i.e. two days

before FBI Agents (who had been observing the Gardner Lane residence since November 8, 2013) descended upon his RV in Tucson.

## THE UNLAWFUL ENTRY AND SEIZURE OF THE DEFENDANT'S RV TRAILER CANNOT BE JUSTIFIED UNDER THE PRETENSE OF ADMINISTRATIVE FORFEITURE

In a report written by FBI Agent Acee on November 25, 2013, he noted that the defendant's travel trailer and two other vehicles and a motor cycle had been administratively seized on November 17, 2013 pursuant to 18 U.S.C. § 981(b)(2)(B). (Government Disclosure p. 166). 18 U.S.C. § 981(b)(2) states:

> Seizures pursuant to this section shall be made pursuant to a warrant obtained in the same manner as provided for a search warrant under the Federal Rules of Criminal Procedure, except that a seizure may be made without a warrant if—
>
> (A) a complaint for forfeiture has been filed in the United States district court and the court issued an arrest warrant in rem pursuant pursuant to the Supplemental Rules for Certain Admiralty and Maritme Claims;
>
> (B) there is probable cause to believe that the property is subject to forfeiture and—
>
> (i) the seizure is made pursuant to a lawful arrest or search; or
>
> (ii) another exception to the Fourth Amendment warrant requirement would apply; or
>
> (C) the property was lawfully seized by a State or local law enforcement agency and transferred to a Federal agency.

It should be noted that a Controlled Substances Forfeiture Complaint was indeed filed in the District Court of the State of New Mexico **but** not until December 17, 2013. (See

Attachment A) This complaint referenced only the 1999 Sportsmen Sport Travel Trailer which was to be forfeited to the Las Cruces-Dona Ana County Metro Narcotics Agency. It should be pointed out that in paragraph 2 of the Complaint the following incorrect information was included: "the above described personal property subject to the forfeiture is and was at all times materials hereto, within Dona Ana County, State of New Mexico." Furthermore, in paragraph 14 the following incorrect information was also included: "Subsequently, on November 17, 2013 Metro agents seized the **personal property** located at 595 N.Valley Drive, space #3, Las Cruces, New Mexico." On February 4, 2014 District Judge Arrieta of the New Mexico District Court issued a Summons to the defendant, Matthew Maley giving him 30 days to respond to the Forfeiture Complaint.

## CONCLUSION

In light of all the above, the evidence obtained as a result of the unlawful search and seizure of Matthew Maley's RV with an arrest warrant only on November 17, 2013 must be suppressed as the "fruit of the poisonous tree." *Wong Sun v. United States,* 371 U.S. 471, 484 (1963).

RESPECTFULLY SUBMITTED: October 31, 2016

JON M. SANDS
Federal Public Defender

*s/   MICHAEL P.P. SIMON*
Assistant Federal Public Defender

cc: Shelley Clemens, AUSA