**JON M. SANDS**
Federal Public Defender
**MICHAEL P.P. SIMON**
Assistant Federal Public Defender
State Bar No. 013096
mike_simon@fd.org
407 West Congress, Suite 501
Tucson, Arizona 85701-1716
Telephone: (520) 879-7500
Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | ) | |
|---|---|---|
| | ) | CR14-637-TUC-RM (LAB) |
| Plaintiff, | ) | |
| | ) | **REPLY TO GOVERNMENT'S** |
| vs. | ) | **RESPONSE TO DEFENDANT'S** |
| | ) | **MOTION TO SUPPRESS EVIDENCE** |
| Matthew Duke Maley | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

The defendant, Matthew Duke Maley, by and through undersigned counsel hereby Replies to the Government's Response to his Motion to Suppress Evidence. The reasons for this pleading are set forth more fully in the attached memorandum of points and authorities.

RESPECTFULLY SUBMITTED: December 6, 2016

                JON M. SANDS
                Federal Public Defender

                 *s/   MICHAEL P.P. SIMON*
                Assistant Federal Public Defender

cc: Shelley Clemens, AUSA

1

## MEMORANDUM OF POINTS AND AUTHORITIES

**A. The Entry was Unlawful**

**There is a simple way for the police to avoid many complex search and seizure problems. Get a search warrant. Had they obtained a search warrant in this case- as they could well have-there would have been no motion to suppress, no hearing, no objection at trial and no thorny issues for us to resolve on appeal. But they didn't. So once again we consume a few pages of the Federal Reporter analyzing the circumstances under which the police may enter a house without a search warrant.** (Emphasis added) *United States v. Harper*, 928 F.2d, 894, 895 (9th Cir. 1991) *overruled on other grounds by United States v. King,* 687 F.3d 1189 (9th Cir. 2012).

The above quotation in an opinion authored by Judge Kozinski, and cited to by the Government, in its Response at page 9, is instructive since it goes to the heart of the matter in this case. Despite the plethora of explanations and accompanying inapposite and distinguishable cases, the Government fails to explain why its agents, a veritable task force of personnel from two states and two counties, decided that the best course of action on the morning of November 17, 2017, was first, to knock and announce and enter without consent a double-wide trailer, on property where they knew Mr. Maley's wife resided. This was their first transgression. An arrest warrant does not carry with it the authority to enter the homes of third persons. *Id.* citing *Steagald v. United States,* 451 U.S. 204. The *Steagald* opinion goes on to say that officers may not enter a third party's residence to execute an arrest warrant without first obtaining a search warrant "based on their belief that [the suspect] might be a guest there," unless the search is consensual or justified by exigent circumstances. *Id.* at 213, 216. In so reasoning, the Court rejected the Government's argument as to the "practical

problems [that] might arise if law enforcement officers are required to obtain a search warrant before entering the home of a third party to make an arrest" and concluded that "the inconvenience incurred by the police is simply not that significant and in any event "cannot outweigh the constitutional interests at stake". *Id.* at 220-22.

And then, they entered a travel trailer, attached to the double-wide by means of water, sewage, and electrical utility lines, with the pull outs, stairs, and awnings extended and significantly **not** hooked up to any of the vehicles also parked in the driveway. They entered both of those trailers and found in the RV, not Mr. Maley, but incriminating evidence, allegedly in plain view, which they then proceed to inventory, until such time as the bright idea occurred to them to seek a search warrant, after they had already, by admission, **seized** the travel trailer.

The Government argues that agents had reason to believe Mr, Maley was at the trailer at the time that they attempted to execute the arrest warrant and cites to *United States v. Diaz*, 491 F.3d, 1074 and its analysis of the standard for reason to believe a suspect is at home. But the facts in *Diaz* are vastly different from the facts of the instant case. Diaz lived on the Fort Hall Indian Reservation in Idaho. He worked from home as a mechanic and often had several cars at the house. He protected his house with dogs and security cameras. In July 2003 police visited Diaz's home and he was present and consented to them looking around. They went back to his house three or four more times during the next eighteen months. He usually answered the door, although once he took about 45 minutes to do so. He told officers

3

they could usually find him at his house during the day and in fact they usually did. On February 23, 2005, Diaz was indicted and an arrest warrant issued. That afternoon officers from several agencies converged on his house, knocked and announced, entered by force, saw a plastic baggies, left the house, obtained a search warrant, and went back inside. *Id.* 1076. It is worth noting that of all the distinguishing facts between the two cases, perhaps the most glaring is that there has been no evidence presented that Mr, Maley was ever seen by agents at either of the trailers located at the Gardner Lane residence.

Indeed, in H*arper,* the police had uncorroborated evidence that the defendant was living at a house leased to two of his brothers and through intermittent surveillance, they observed him entering the home with his own key once or twice during a three day period. In addition the police knew that Harper had lived with his family at another address immediately before he was incarcerated. In addition, the police saw cars belonging to known associates of the defendant parked at the Harper home. According to the court: "This information was sufficient to give the police probable cause to believe he resided there but just barely. **It would have been far more prudent to get a search warrant.**" (Emphasis added). *Id.,* at 896-7.

The Government further argues that there certainly was a "fair probability" that the defendant was present in the residence when the agents came to arrest him. This despite the fact that they never actually saw him there, as the police did in *Diaz and Harper.* Vehicles were present in the driveway but at one point the Government notes agents identified in

4

August 2013 an olive-colored Land Rover as being a vehicle used by the defendant in Las Cruces (Response, p.2) but later states that a silver Land Rover was present on the property in Tucson on November 8 and that this had been moved along with a black Dodge Ram when they observed them again on November 9. (Response, p.3) No mention is made of the tan Ford Crown Victoria. Moreover, it surely would have been plausible that the Maley family members who were living at the residence might also have possessed transportation. Nor should it be overlooked that, in fact, as we know from a license-plate reader and subsequent trial testimony, Mr. Maley was actually in a Land Rover travelling north on Highway 25 in New Mexico on November 15, 2013 (not November 13, 2013 as stated in the Response at p. 5). It should also be pointed out that a recent opinion has held that the good-faith exception does not apply to officers' unlawful entry into a residence to search for the subject of their arrest warrant where the officers' conduct was, at a minimum, grossly negligent, *United States v. Vasquez-Algarin,* 821 F.3d 467, 482-83 (3d. Cir. 2016).

**B. Plain View**

The Government is correct in its summary of the requirements for a plain view seizure. Of particular importance, given the facts of the instant case, is that the agents were authorized to search anywhere the defendant **could have been present** within the residence. Further, officers may, indeed, seize evidence of a crime in plain view without a warrant provided they are **lawfully** in a position from which to view the evidence, they have a **lawful** right of access to the evidence, and its incriminating nature is **immediately apparent.**

*Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993), *Horton v. California,* 496 U.S. 128, 134-37.

The *Horton* opinion also goes on to quote the criteria that generally guide 'plain view' seizures as set forth in *Coolidge v. New Hampshire*, 404 U.S. 443 (1971):

> What the 'plain view' cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused. The doctrine serves to supplement the prior justification – whether it be a warrant for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present unconnected with a search directed against the accused and permits the warrantless search. Of course, the extension of the original justification is legitimate only where it is immediately apparent to the police that they have evidence before them; the plain view doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges. *Id.* at 469.

Indeed, courts have found that the plain view doctrine failed to justify a search, see *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 549 (6th Cir. 2003) (plain view exception did not justify a second and third search as officers were not lawfully in the residence); *United States v. Arreguin*, 735 F.3d 1168, 1175, 1178-79 (9th Cir. 2013) (concluding plain view doctrine did not apply to seizure of contraband because the government was not lawfully on the premises); *United States v. Murphy*, 516 F.3d 1117, 1121 (9th Cir. 2008) (holding plain view exception did not apply because officers only discovered meth lab during unlawful search of defendant's storage unit, *abrogated on other grounds by Fernandez v. California*, 134 S.Ct. 1126 (2014).

The Government claims that, having broken into the travel trailer, a small area consisting of two rooms and a bathroom, and while searching for the 6'2" 190 pound defendant, agents observed in plain view not one piece of contraband or one illegal item – after which, as in *Diaz*, they could have stopped their search for their suspect, left the trailer, obtained a search warrant and returned – but a treasure trove of illegality. According to the Government's Response at page 4, while searching for a large man in a small space, the agents in plain view observed firearms, ammunition, armored vests with plates, U.S. currency, baggies of a crystalline substance that was consistent with methamphetamine, drug packaging materials, a scale, documents with the defendant's names on them, rifle cases, handgun cases, firearm holsters, and two combination safes. It defies logic to think that in the moments or, indeed, seconds, that it would have taken to ascertain if Mr. Maley was inside this small area, that the agents would have inadvertently come across all these items. How, for example, would an agent, ostensibly searching for a suspect, happen upon a document with his name on it. Rather than searching for a human being, these agents appear to have conducted a complete and thorough examination of the entirety of this travel trailer. There was nothing inadvertent about this, Indeed, they were in the process of doing their own inventory when the idea finally dawned on them to go and get a search warrant. And finally, as noted in the defendants's Motion to Suppress, and unaddressed by the Government in its Response, all of this stands in sharp contrast to the testimony of the very same agents at Mr. Maley's trial in the District of New Mexico, one of whom testified that he didn't recall

personally seeing any firearms or anything of contraband there. (Quoted in defendant's Motion to Suppress at page 10.)

C. **The Seizure and Search of the Trailer was Improper**

The Government cites to *United States v. Kimak*, 624 F.2d 903, 905-906 (9th Cir. 1980) (warrantless search of automobile upheld as agents had probable cause to believe the automobile had been used to transport MDA, and could be seized for forfeiture). However, the facts in *Kimak* were rather different from the instant case. Mr. Kimak was arrested within half an hour of the purchase of a pound of MDA by an undercover agent, who had been told that Mr. Kimak was in a nearby car waiting to receive payment for the sale of the drugs. After his arrest, his car keys were taken from him, he was handcuffed and mirandized and then one of the agents opened the trunk of his car but closed it without seizing anything, and then the car was transported to the DEA garage where it was searched and contraband discovered. Significantly, the court went on to distinguish the facts in the case before it, from the facts in another Ninth Circuit case, relied upon by the defendant, Kimak, *United States v. McCormick,* 502 F.2d 281, 287 (9th Cir. 1974):

> That was a case where the seizure of McCormick's car was not made until two and one-half months after the agents had probable cause to believe that it had been used illegally. It is clearly distinguishable. Here the seizure of the defendant's car occurred within minutes after the agents obtained knowledge of its illegal use, and substantially contemporaneously with his arrest. Indeed, at the time of the seizure, the automobile was on the street and not only had been, but was still being used to facilitate the completion of the sale of MDA. *Id.*

It is clear that the *McCormick* case facts are much more analogous to the instant case. As the Government points out in its Response at pages 2-3, undercover agents made drug purchases directly from a third party, Jennifer Sanders, after she had entered and exited the trailer, then in Las Cruces, but on August 1, 2 and 21 of 2013 i.e. three months before the task force of agents went to the Gardner Lane residence in Tucson.

    Nor does the Government succeed in its attempt to use the automobile exception to get around the fourth amendment's prohibition against warrantless search and seizures. Firstly, unlike *California v. Carney,* 471 U.S. 386, 391 (1985), the facts of the case before this court do **not** involve a lawfully parked, but fully mobile motor home, parked on a public street. In fact, C*arney* involved the search of a motor home located in a public parking lot in downtown San Diego. The facts of the instant case involve a travel trailer connected to a nearby residential double wide trailer by sewage, water, and electrical utility lines, with slide out compartments of the travel trailer, along with stairs and awnings all fully extended, parked in a private driveway.

    Nor is this case analogous to the facts of *United States v. Hamilton,* 797 F.2d 837 (9th Cir, 1986). In *Hamilton* a bank robbery occurred on July 12, 1983 in Los Angeles, and a police officer heard that the suspect was a black man driving a white Cadillac. A short time later the vehicle was stopped, Mr. Hamilton was identified by a witness at the bank, and he was arrested. Also in the vehicle was Davis, a female co-defendant. The next day FBI agents contacted the owner of the Cadillac that Hamilton had been driving who indicated that he

had loaned the car to Davis for a few hours on the day of the robbery. He further stated that he had seen a motor home at Davis's premises and had seen people removing articles from the house and putting them in the motor home. He provided a license plate number for the motor home and stated that he knew it had been moved to another address. This address turned out to be where Hamilton's mother lived. Agents went to the address and found the motor home parked in the driveway of a house and attached to the home's electric utilities by means of an extension cord. The door of the motor home was open, two teenagers were inside it listening to the radio and Hamilton's mother said it was owned by her son and gave the agents permission to enter and search it. They went in and found evidence that was subsequently used at trial. Clearly, there are obvious differences with the facts of the instant case – the search of the motor home took place within a day of the arrest of its owner, not two and a half months after agents had last seen it in a different city and state; the search took place after agents received consent from a third party to enter rather than after agents broke into it having failed to gain third party consent; and last but not least there is a difference between a motor home that is capable of being driven as soon as someone gets into the driver's seat and a travel trailer that is not capable by itself of movement but must be towed by a vehicle.

    Another recent case addresses this issue.   Police cannot rely on the automobile exception to justify a search of a car parked in a residential driveway, even though a drug-dog alerted on it, where no exigent circumstances existed making it impractical to first

obtain a warrant.  *United States v. Beene,* 818 F. 3d 157, 164-66 (5th Cir. 2016), *petition for cert. docketed.*

### D. The Government's Forfeiture Powers Do Not Trump The Fourth Amendment

The Government cites to 21 U.S.C. §881 (a)(4) and asserts that illegally seized evidence need not be suppressed if it would have been inevitably discovered through routine forfeiture procedures. However, 21 U.S.C. §881(b) entitled Seizure procedures states that property subject to forfeiture may be seized pursuant to 18 U.S.C. §981(b) which, as noted in the Defendant's Motion to Suppress, at pp. 19-20, the Government's own actions fall afoul of.

### CONCLUSION

The Defendant's Motion to Suppress Evidence illegally obtained must be granted.

RESPECTFULLY SUBMITTED: December 6, 2016

JON M. SANDS
Federal Public Defender


 s/    MICHAEL P.P. SIMON
Assistant Federal Public Defender


cc: Shelley Clemens, AUSA

11